United States District Court
Southern District of Texas
**ENTERED**
September 22, 2020
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| EDWARD TAYLOR, | § | CIVIL ACTION NO. |
| Plaintiff, | § | 4:18-cv-04811 |
| | § | |
| | § | |
| vs. | § | JUDGE CHARLES ESKRIDGE |
| | § | |
| | § | |
| HARRY HARTLEY, *in his* | § | |
| *individual capacity*, and | § | |
| HARRIS COUNTY, | § | |
| TEXAS | § | |
| Defendants. | § | |

MEMORANDUM AND OPINION
RESOLVING MOTIONS TO DISMISS

The motion to dismiss filed by Defendant Harry Hartley is denied. Dkt 19. His assertion of qualified immunity doesn't overcome the facts as pleaded in the complaint by Plaintiff Edward Taylor.

The motion to dismiss filed by Defendant Harris County is granted. Dkt 18. The civil rights claims under 42 USC § 1983 asserting municipal liability are dismissed without prejudice. The claims under the Americans With Disabilities Act and the Rehabilitation Act are dismissed with prejudice.

1.   Background

This is a civil rights action. The standard of review in the present posture requires that the allegations in Taylor's amended complaint be accepted as true. *Walker v Beaumont Independent School District*, 938 F3d 724, 735 (5th Cir 2019). That complaint factually pleads as follows.

Taylor suffers from cognitive, behavioral, and physical disabilities. He has "epilepsy, lack of motor functions, speech impediments, brain damage/trauma, and mental illness." Dkt 17

at ¶ 21. These conditions substantially limit "his ability to care for himself, eat, sleep, speak, learn, read, concentrate, think, communicate, interact with others, work, and consortium activities." Id at ¶ 23. They also substantially limit "the operation of his immune, digestive, bowel, bladder, neurological, brain, and respiratory systems." Id at ¶ 26. And these conditions cause "headaches, confusion, memory problems, and nausea" and result in "cognitive, behavioral, and physical disabilities." Id at ¶¶ 24–25.

Taylor was arrested for assault while receiving treatment for his disabilities at a hospital in February 2017. Id at ¶ 19. He was taken to the Harris County Jail. Taylor alleges that, while he was waiting in line with other inmates being processed into the jail, his mental issues were "obvious to all present." Id at ¶¶ 28–29. He doesn't explain why this was so.

Hartley is an officer with the Harris County Sheriff's Office. He was present when Taylor was waiting in line. Taylor alleges that Hartley "was being 'mouthy' to all the inmates." Id at ¶ 30.

When it was Taylor's turn to be checked in and moved to the courtroom for his initial appearance, Hartley yelled at him to "take his gay ass hat off." Id at ¶ 32. Taylor asserts that he felt threatened, had a mental outburst, and swung at Hartley. Id at ¶ 34. Hartley caught Taylor's arm, threw him to the ground, slammed his head into the concrete, and then proceeded to punch him in the face fifteen times. Id at ¶¶ 35–39. Taylor was limp and unconscious after the second punch to his face, but Hartley only stopped because another officer pulled him away and off of Taylor. Id at ¶¶ 40–41.

Taylor asserts that at no point did he resist or try to defend himself. Id at ¶¶ 43–44. And he alleges that Hartley's "excessive use of force" and "attempt to kill" him occurred after he was already restrained. Id at ¶¶ 56–57. One inmate apparently described the incident as Hartley "hammering on Plaintiff." Id at ¶ 46. Others yelled at Hartley to stop because they thought he was going to kill Taylor. Id at ¶ 47. The amended complaint states, "Other inmates viewing this incident agreed that the force was unnecessary and excessive." Id at ¶ 45.

Taylor was taken to a hospital for his injuries. He required a surgically inserted shunt to relieve pressure on his brain, treatment for an antibiotic-resistant infection, and surgical clipping of an aneurysm, in addition to other medical care. Id at ¶¶ 65–66. He has also undergone extensive follow-up care and surgical procedures. Id at ¶ 68.

As to the arrest that brought Taylor to the Harris County Jail in the first place, a grand jury eventually determined that there were inadequate grounds for prosecution. He was never formally charged. Id at ¶ 20. He notes that he was charged with assault on a public servant with respect to the incident at hand, which was also dismissed. Id at ¶ 63.

Taylor alleges that Hartley wasn't charged with any crime or disciplined in any way, despite Taylor sending a "demand letter" that isn't otherwise described. Id at ¶ 64. He also asserts that Hartley lied about the incident in the offense report, in which he wrote that Taylor "rose up against Hartley" and "made attempts to continue to strike Hartley." Id at ¶ 58. Taylor also devotes nearly two pages in his complaint to describing a history by Hartley of abuse and poor performance, including racially derogatory remarks, verbal aggression, refusal to give medical treatment, anger-management issues, and general bullying and belittling conduct. Id at ¶¶ 69–72. Taylor asserts that Harris County ignored complaints about Hartley and allowed him to ridicule his coworkers in front of staff and inmates without discipline. Id at ¶ 73.

Taylor sued Hartley in his individual capacity under 42 USC § 1983 for excessive use of force. He stated additional claims against Harris County under 42 USC § 1983 for failure to train and ratification. He also alleges Harris County is liable under the Americans With Disabilities Act, 42 USC § 12101 et seq, and the Rehabilitation Act, 29 USC § 794.

### 2. Legal standard

Rule 8(a)(2) of the Federal Rules of Civil Procedure requires a plaintiff's complaint to provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Rule 12(b)(6) allows the defendant to seek dismissal if the plaintiff fails "to state a claim upon which relief can be granted."

Read together, the Supreme Court has held that Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v Iqbal*, 556 US 662, 678 (2009), quoting *Bell Atlantic Corp v Twombly*, 550 US 544, 555 (2007). To survive a Rule 12(b)(6) motion to dismiss, the complaint "must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *Cuvillier v Taylor*, 503 F3d 397, 401 (5th Cir 2007), quoting *Twombly*, 550 US at 555.

A complaint must therefore contain enough facts to state a claim to relief that is plausible on its face. *Twombly*, 550 US at 570. A claim has *facial plausibility* "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 US at 678, citing *Twombly*, 550 US at 556. This standard on plausibility is "not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 US at 678, quoting *Twombly*, 550 US at 557.

Review on motion to dismiss under Rule 12(b)(6) is constrained. The reviewing court must accept all well-pleaded facts as true and view them in the light most favorable to the plaintiff. *Walker*, 938 F3d at 735. The court must also generally limit itself to the contents of the pleadings and its attachments. *Brand Coupon Network LLC v Catalina Marketing Corp*, 748 F3d 631, 635 (5th Cir 2014).

But a notable exception allows a defendant to attach documents "if they are referred to in the plaintiff's complaint and are central to her claim." *Collins v Morgan Stanley Dean Witter,* 224 F3d 496, 498–99 (5th Cir 2000), quoting *Venture Associates Corp v Zenith Data Systems Corp,* 987 F2d 429, 431 (7th Cir 1993). The Fifth Circuit characterizes this as a "limited exception." *Scanlan v Texas A&M University*, 343 F3d 533, 536 (5th Cir 2003). Where appropriate, review of such evidence can assist the court "in making the elementary determination of whether a claim has been stated." *Collins,* 224 F3d at 498–99.

4

3.   Inclusion of videotape screenshots

Videotape recordings from the jail hallway apparently captured the incident between Taylor and Hartley. Dkt 17 at ¶ 2. The videotape itself isn't before the Court and hasn't been reviewed. But with their motions to dismiss, Hartley and Harris County attached five screenshots captured from the moments before the physical encounter itself commenced.

Taylor objects. An initial issue is whether these screenshots can properly be considered in the current procedural posture.

a.   Consideration under Rule 12(b)(6)

Hartley and Harris County explain the screenshots this way:

> The video depicting the beginning of this incident clearly reveals that the incident began with Plaintiff's provocation of physical violence as alleged in Plaintiff's First Amended Complaint. The following screen captures demonstrate the 5 seconds at the beginning of this incident where DO Hartley provided instructions to the Plaintiff to remove his hat, the Plaintiff appeared to comply with these instructions and then, just as DO Hartley directed his attention away, the Plaintiff abruptly turned to attack DO Hartley.

Dkt 18 at 2; Dkt 19 at 1–2.

Inspection of the screenshots show date and time stamps spanning just over three seconds. Only the back and top of Hartley's head is visible. The screenshots are accompanied by descriptive captions stating:

> o   *DO Hartley Speaking Directly to Plaintiff Directing Plaintiff to Remove His Hat*;
>
> o   *DO Hartley's Attention Directed to Plaintiff, Plaintiff Apparently Complying*;
>
> o   *DO Hartley's Attention Directed Away from Plaintiff, Plaintiff Abruptly Turning Back*;
>
> o   *Plaintiff Drawing Left Arm Back to Attack DO Hartley;* and

5

   o *Plaintiff Lunging At & Attacking DO Hartley.*

Dkt 18 at 2–3, Dkt 19 at 2–3. The final screenshot stops short of showing actual physical contact between them. Nothing from the subsequent beating or its aftermath appears.

Hartley and Harris County argue that consideration of the screenshots is permissible because Taylor referenced the videotape in his complaint. See Dkt 17 at ¶¶ 2, 42, 60, 61, 103. This, they say, makes it central to the claims at issue. Dkt 23 at 2. Taylor calls these "cherry-picked, dubiously-captioned screenshots" that cannot be considered. Dkt 22 at 16.

Federal courts in Texas have accepted and considered videotape footage on motions to dismiss excessive-force claims under Section 1983. See *Burkett v City of Haltom City*, 2015 WL 3988099, *3 n 4 (ND Tex); *Robles v Aransas County Sheriff's Department*, 2016 WL 4159752, *4 (SD Tex). On appeal in the latter case, the Fifth Circuit found that the district court properly considered the videotape. *Robles v Ciarletta*, 797 F Appx 821, 832 (5th Cir 2019) (unpublished). But the defendants in both *Robles* and *Burkett* attached footage depicting the entire incident. For example, see *Robles*, 2016 WL 4159752 at *6 (discussing at least six minutes of videotape footage along with audio).

To the contrary here, Hartley and Harris County have attached only a small selection of screenshots from the beginning of the incident—rather than the videotape itself. The standard on review can't be stretched so far. Indeed, federal courts have recognized in other contexts that parties cannot "make use of video segments that have been 'cherry-picked'" where the remainder is unavailable for the court's review. For example, see *United States v Yevakpor*, 419 F Supp 2d 242, 252 (NDNY 2006). And in an analogous procedural posture, the Fifth Circuit has held it as error for a court to consider only quoted portions of a document where the entire document isn't itself attached to the motion to dismiss. *Scanlan*, 343 F3d at 536–37; see also *O'Malley v Brown Brothers Harriman & Co*, 2020 WL 1033658, *4 (WD Tex) (declining to consider attached document where plaintiff questioned its veracity and completeness). This same must naturally pertain to screenshots of videotape subject to consideration on motion to dismiss.

Hartley and Harris County argue that the beginning of the videotape as depicted by the selected screenshots "clearly reveals that the incident began with Plaintiff's provocation of physical violence." Dkt 19 at 1. Perhaps. But those screenshots by their nature give no audible or visual context for anything that preceded any initial exchange between Hartley and Taylor. More troubling, the screenshots ignore the main thrust of the allegations at hand. Taylor alleges that Hartley "beat [him] within an inch of his life" and continued to punch him even "after he went limp and unconscious." Dkt 17 at ¶¶ 37, 40. Eyewitnesses are alleged to characterize it the same way, with medical evaluations tending to corroborate the extreme nature of this beating. Id at ¶¶ 45, 65–68.

Indeed, this is all apparently on the subject videotape. It specifies that "the video shows he [Hartley] punched Plaintiff 15 times." Id at ¶ 61. But none of that is depicted in the submitted screenshots. Hartley and Harris County cannot on motion to dismiss so lightly limit the context and gravity of what Taylor endured by only including select screenshots that by their nature are more relevant to their later defense. See *Scanlan*, 343 F3d at 537 (improper for district court to consider attached report where more central to defenses).

The Court finds that Hartley and Harris County improperly included the screenshots in their motions to dismiss. They won't be considered as part of the pleadings for purposes of further consideration here.

### b.   Consideration under Rule 56

Hartley and Harris County alternatively ask to convert their motions into ones for summary judgment if the screenshots aren't considered as part of the pleadings. Dkt 23 at 2–3. This would depend on the Court finding the screenshots to assist consideration on summary judgment. They don't.

Federal Rule of Civil Procedure 12(d) provides, "If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." This permits—but doesn't require—the reviewing court to accept and consider materials submitted outside the

pleadings on motion to dismiss. It is a question of discretion, and a court is to exercise that discretion by determining whether the proffered material is likely to facilitate disposing of the action. *Isquith for & on Behalf of Isquith v Middle South Utilities Inc*, 847 F2d 186, 194 n 3 (5th Cir 1988).

A respected treatise on this rule states, "When the extra-pleading material is comprehensive and will enable a rational determination of a summary judgment motion in accordance with the standard set forth in Rule 56, the district court is likely to accept it; when it is scanty, incomplete, or inconclusive, the district court probably will reject it." Charles Wright and Arthur Miller, *Federal Practice and Procedure* § 1366 (3d ed). The five selected screenshots are both incomplete and inconclusive, making them just as indeterminate on summary judgment as they are on motion to dismiss. Considering them in no way advances resolution of this case.

The Fifth Circuit also counsels against conversion to a motion for summary judgment without affording the adversary "an opportunity to conduct discovery." *Benchmark Electronics Inc v JM Huber Corp*, 343 F3d 719, 725 (5th Cir 2003) (reversing district court decision to convert motion for judgment on pleadings); see also *Mitsui Sumitomo Insurance Co (HK) v P&O Ports Louisiana Inc*, 2007 WL 2463308, *2 (ED La) (declining to convert at "an early point in the litigation"). Discovery in this matter doesn't close until April 15, 2021. Dkt 31. Were this Court to consider the five screenshots, Taylor would no doubt seek to submit the entirety of the videotape along with requests for "time to obtain affidavits or declarations or to take discovery." See FRCP 56(d)(2). In short, the five screenshots create—but don't resolve—issues of material fact.

The Court declines to convert the motions to dismiss into ones for summary judgment.

### 4. Motion to dismiss by Hartley

Hartley invokes the affirmative defense of qualified immunity. This is a topic of renewed and considerable debate. Hartley's briefing evinces seeming belief that its talismanic invocation somehow prevents scrutiny of his conduct. That is decidedly not so.

a.   Qualified immunity, examined

The Fifth Circuit has recently wrestled with the doctrine. See *Zadeh v Robinson*, 928 F3d 457 (5th Cir 2019); *Cole v Carson*, 935 F3d 444 (5th Cir 2019) (*en banc*). And the Supreme Court had nine petitions for *certiorari* pending for review relating to qualified immunity at the conclusion of its most recent term. But it declined to grant any of them. Marcia Coyle, *Supreme Court Conference Watch: Qualified Immunity, State Bar Fees and Firearms* (The National Law Journal, May 27, 2020), archived at https://perma.cc/ZAV7-HB2G. Brief review of the development and current debate on this doctrine provides helpful context.

The statute colloquially known as *Section 1983* imposes liability on state actors who violate constitutional or other legal rights. Congress enacted it during Reconstruction as part of the Ku Klux Klan Act in 1871 in an effort to combat lawlessness and civil-rights violations in southern states. "The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." *Wyatt v Cole*, 504 US 158, 161 (1992), citing *Carey v Piphus,* 435 US 247, 254–57 (1978).

The statute originally provided:

> That *any* person who, under color of any law, statute, ordinance, regulation, custom, or usage of any State, shall subject, or cause to be subjected, *any* person within the jurisdiction of the United States to the deprivation of *any* rights, privileges, or immunities secured by the Constitution of the United States, *shall*, any such law, statute, ordinance, regulation, custom, or usage of the State to the contrary notwithstanding, be liable to the party injured in any action at law, suit in equity, or other proper proceeding for redress . . . .

An Act to Enforce the Provisions of the Fourteenth Amendment to the Constitution of the United States, and for Other Purposes, Pub L No 42-21, 17 Stat 13 (1871) (emphasis added).

The text of the statute on its face created a standard of strict liability. It makes no reference to immunity—qualified or otherwise.

Congress rephrased and reenacted the provision a few years later as Section 1979 of the Revised Statutes of 1874, An Act to Protect All Citizens in Their Civil and Legal Rights, 18 Stat 335 (1875). As currently amended and codified, the statute provides:

> *Every* person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, *any* citizen of the United States or other person within the jurisdiction thereof to the deprivation of *any* rights, privileges, or immunities secured by the Constitution and laws, *shall* be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 USC § 1983 (emphasis added).

The text is slightly rephrased but remains strikingly similar to the original. And were the text chosen by Congress this Court's only guide, it would appear to create a standard of strict liability. Indeed, the Supreme Court has observed that Section 1983 "creates a species of tort liability that on its face admits of no immunities." *Imbler v Pachtman*, 424 US 409, 417 (1976).

As thus construed, it would also serve a fundamental principle of the rule of law—where there is a right, there must be a remedy for its violation. To say this has deep roots in American jurisprudence is an understatement. As Justice White wrote for a unanimous Supreme Court in *Franklin v Gwinnett City Public Schools*:

> From the earliest years of the Republic, the Court has recognized the power of the Judiciary to award appropriate remedies to redress injuries actionable in federal court, although it did not always distinguish clearly between a right to bring suit and a remedy available under such a right. In *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 163, 2 L.Ed. 60 (1803), for

example, Chief Justice Marshall observed that our Government "has been emphatically termed a government of laws, and not of men. It will certainly cease to deserve this high appellation, if the laws furnish no remedy for the violation of a vested legal right." This principle originated in the English common law, and Blackstone described it as "a general and indisputable rule, that where there is a legal right, there is also a legal remedy, by suit or action at law, whenever that right is invaded." 3 W. Blackstone, Commentaries 23 (1783). See also *Ashby v. White*, 1 Salk. 19, 21, 87 Eng.Rep. 808, 816 (Q.B.1702) ("If a statute gives a right, the common law will give a remedy to maintain that right . . .").

503 US 60, 66–67 (1992).

But despite the seeming categorical imperative arising from the language of Section 1983, the Supreme Court held in *Pierson v Ray* that officials who commit constitutional or statutory violations could raise the defense of "good faith and probable cause" to defeat civil liability. 386 US 547, 557 (1967). It further elaborated on the doctrine in *Harlow v Fitzgerald*, holding that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." 457 US 800, 818 (1982). And it has said that the doctrine is meant to balance two important interests, being "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v Callahan*, 555 US 223, 231 (2009); see also *Johnston v City of Houston, Texas,* 14 F3d 1056, 1059 (5th Cir 1994).

Qualified immunity thus now protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson*, 555 US

at 231, quoting *Harlow,* 457 US at 818. But many have noted that the doctrine risks eclipsing the remedy as enacted by Congress at 42 USC § 1983. And it is the requirement of *clearly established law* that has evoked concern.

The Fifth Circuit observed in *Sims v City of Madisonville,* "This is the fourth time in three years that an appeal has presented the question whether someone who is not a final decisionmaker can be liable for First Amendment retaliation. . . . Continuing to resolve the question at the clearly established step means the law will never get established." 894 F3d 632, 638 (5th Cir 2018) (*per curiam*). The following year in *Zadeh v Robinson,* the Fifth Circuit held that members of the Texas Medical Board violated a doctor's constitutional rights through a warrantless search of his office and medical records. 928 F3d 457, 468 (5th Cir 2019). Yet it held the defendants were entitled to qualified immunity because the unlawfulness of their conduct wasn't clearly established at the time of the search. Id at 470. Judge Willett specifically drew attention to a "growing, cross-ideological chorus of jurists and scholars urging recalibration of contemporary immunity jurisprudence." 928 F3d at 480 (Willett concurring in part). Examining the requirement of *clearly established law* in the qualified-immunity analysis, he observed, "This current 'yes harm, no foul' imbalance leaves victims violated but not vindicated. Wrongs are not righted, and wrongdoers are not reproached." Id at 479 (Willett concurring in part).

The Fifth Circuit has nevertheless declined to reconsider its approach to qualified immunity, finding itself bound by both its own prior decisions and those of the Supreme Court. See *Garcia v Blevins,* 957 F3d 596, 602 (5th Cir 2020). As such, the doctrine must be applied here as it currently stands. Still, the foregoing undermines any suggestion that its invocation yields a foregone conclusion. And it certainly belies Hartley's argument that the Court can't take a close look at his conduct and determine whether, under color of law, he subjected a citizen of the United States to the deprivation of rights secured by the Constitution.

### b.   Qualified immunity, applied

Hartley raises the affirmative defense of qualified immunity in response to Taylor's claim against him for excessive use of

force. But rather than engage with the facts as pleaded, Hartley sponsors his own version of the events to support qualified immunity. To the contrary, the pertinent scrutiny focuses only on his conduct as pleaded in the amended complaint.

i.    Consideration of well-pleaded facts

The underlying merits in *Ashcroft v Iqbal* addressed issues of qualified immunity pertaining to allegations of racial and religious discrimination against individuals detained after the attacks of September 11th. 556 US 662 (2009). That action didn't proceed past the pleading stage, but it would be a mistake to read the decision as a *free pass* for government actors accused of unconstitutional conduct.

The procedural focus in *Iqbal* was clarification of the pleading standard at the motion to dismiss stage. The Supreme Court had previously stated, "The threshold inquiry a court must undertake in a qualified immunity analysis is whether plaintiff's allegations, if true, establish a constitutional violation." *Hope v Pelzer*, 536 US 730, 736 (2002). It left that starting point relatively untouched—being the consideration of well-pleaded facts in the complaint, accepting them as true, and viewing them in the light most favorable to the plaintiff. See *Iqbal*, 556 US at 678.

Hartley argues that he is entitled to qualified immunity against Taylor's cause of action for an unconstitutional exercise of force. Yet he all but concedes that qualified immunity doesn't reach the conduct *as pleaded* in the amended complaint. This is so because he neither accepts the factual allegations at face value nor argues that the specified conduct depicts action within constitutional bounds. He instead uses the screenshots addressed above to suggest a milder version of events—and then argues why that *revised* narrative entitles him to qualified immunity.

His motion itself in fact makes only this generic reference to what happened after what is seen in the proffered screenshots: "DO Hartley utilized physical force to both protect himself and others, and to subdue Plaintiff." Dkt 19 at 1. No factual reckoning appears. The reply likewise doesn't address any particular allegation. Rather, after defending submission of the screenshots, the reply states that "trading blows for blows is proportionate" and that "strikes of the hand" are permissible

when "a detention officer [is] violently ambushed in a hallway with a dozen other unrestrained prisoners present." Dkt 23 at 4.

As a first matter, a *violent ambush* doesn't even closely approximate what the screenshots show, even if they were properly before the Court. But as a second, more important matter, "trading blows for blows" and "strikes of the hand" aren't at all what Taylor pleaded. The amended complaint instead states:

- o "Hartley caught Plaintiff's arm."
- o "Hartley threw Plaintiff to the ground."
- o "Hartley slammed Plaintiff's head into the concrete ground."
- o "Hartley punched Plaintiff in the face 15 times."
- o "Hartley continued to punch Plaintiff in the face after he went limp and unconscious after the second punch to Plaintiff's face."
- o "Hartley only stopped punching Plaintiff because another officer pulled Hartley's arm away and off Plaintiff."
- o "At no point did Plaintiff resist arrest."
- o "At no point did Plaintiff try to defend himself."
- o "Other inmates viewing this incident agreed that the force was unnecessary and excessive."
- o "An inmate described the incident as Hartley hammering on Plaintiff."
- o "Other inmates were yelling at Hartley to stop because they thought he was going to kill Plaintiff."

Dkt 17 at ¶¶ 35–36, 38–41, 43–47.

The Fifth Circuit is clear that "even in the context of qualified immunity, 'the facts alleged' must be '[t]aken in the light most favorable to the party asserting the injury.'" *Anderson v Valdez*, 845 F3d 580, 600 (5th Cir 2016), quoting *Tolan v Cotton* 572 US 650, 655–56 (2014). And so the Court has considered all these allegations and assumes their veracity. See *Iqbal*, 556 US at 679. Simply put, this isn't "an unadorned, the-defendant-unlawfully-harmed-me accusation." Id at 678, quoting *Twombly*, 550 US at 555. The allegations contain "factual content that

allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 US at 678, citing *Twombly*, 550 US at 556.

These allegations also assert facts which, if true, could overcome the defense of qualified immunity. To do so Taylor must allege facts that support a violation of a constitutional right, and the right at issue must be clearly established at the time of the alleged misconduct. *Ashcroft v al-Kidd*, 563 US 731, 735 (2011), citing *Harlow,* 457 US at 818.

ii.    Violation of a constitutional right

To state a claim for the use of excessive force under the Fourth Amendment, Taylor must allege an "(1) injury, (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." *Trammell v Fruge*, 868 F3d 332, 340 (5th Cir 2017), quoting *Deville v Marcantel*, 567 F3d 156, 167 (5th Cir 2009). The first aspect isn't in dispute. Taylor alleges he was injured due to the use of force applied against him. The question is whether he has alleged a use of force that was clearly excessive in a clearly unreasonable way.

The test used to determine whether a use of force was reasonable under the Fourth Amendment "is not capable of precise definition or mechanical application." *Graham v Connor*, 490 US 386, 396 (1989), quoting *Bell v Wolfish*, 441 US 520, 559 (1979). Rather, "its proper application requires careful attention to the facts and circumstances of each particular case." *Graham*, 490 US at 396. The Supreme Court provides a framework for analysis with the following factors outlined in *Graham*:

- *First,* the severity of the crime at issue;

- *Second,* whether the suspect poses an immediate threat to the safety of the officers or others; and

- *Third*, whether the suspect is actively resisting arrest or attempting to evade arrest by flight.

Ibid. The speed with which an officer resorts to force, and the failure to use "physical skill, negotiation, or even commands" before applying such force, weigh in favor of finding that the use

15

of force was excessive to the need. *Newman v Guedry*, 703 F3d 757, 763 (5th Cir 2012).

Taylor admits that he "had a mental outburst and swung at Hartley." Dkt 17 at ¶ 34. Some response by Hartley was thus appropriate under the first *Graham* factor. But the second and third factors suggest that his response could be found excessive to the need and objectively unreasonable. Without warning or attempting to deescalate the situation, Hartley immediately threw Taylor to the ground, slamming his head into the concrete. Hartley then punched Taylor fifteen times, knocking him unconscious after the second. The allegations are clear that this beating continued even after Taylor was no longer resisting or posing any immediate threat.

The Fifth Circuit has observed that "caselaw establishes that it is unreasonable to use force after a suspect is subdued or demonstrates compliance." *Shumpert v City of Tupelo*, 905 F3d 310, 323 (5th Cir 2018). And so these facts, if ultimately found to be true, would support a finding that Hartley's use of force was clearly excessive and objectively unreasonable.

### iii.    Clear establishment of that right

The Supreme Court has held, "A clearly established right is one that is 'sufficiently clear that every reasonable officer would have understood that what he is doing violates that right.'" *Mullenix v Luna*, 136 S Ct 305, 308, (2015), quoting *Reichle v Howards*, 566 US 658, 664 (2012). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Hope,* 536 US at 739 (citations omitted).

The Supreme Court has consistently instructed lower courts not to define the applicable "clearly established law" at a "high level of generality." *White v Pauly*, 137 S Ct 548, 552 (2017), quoting *al-Kidd*, 563 US at 742. Instead, "the clearly established law must be 'particularized' to the facts of the case." *White*, 137 S Ct at 552, quoting *Anderson v Creighton*, 483 US 635, 640 (1987). Even so, a case directly on point isn't required. A "constitutional violation can be 'clearly established' even when there is no materially similar precedent." *Zimmerman v Cutler*, 657 F Appx

16

340, 346 (5th Cir 2016), citing *Hope*, 536 US at 741. "[B]ut existing precedent must have placed the statutory or constitutional question beyond debate." *Mullenix*, 136 S Ct at 308, quoting *al-Kidd*, 563 US at 741.

The pertinent inquiry on assertion of a Fourth Amendment violation is "whether it was clearly established that the Fourth Amendment prohibited the officer's conduct in the 'situation [he or she] confronted.'" *Mullenix*, 136 S Ct at 309, quoting *Brosseau v Haugen*, 543 US 194, 199 (2004). The reviewing court "must be able to point to controlling authority—or a 'robust consensus of persuasive authority'—that defines the contours of the right in question with a high degree of particularity." *Morgan v Swanson*, 659 F3d 359, 371–72 (5th Cir 2011) (*en banc*), quoting *al-Kidd*, 563 US at 742. But "'in an obvious case,' the *Graham* excessive-force factors themselves 'can clearly establish the answer, even without a body of relevant case law.'" *Newman v Guedry*, 703 F3d 757, 764 (5th Cir 2012), quoting *Brosseau*, 543 US at 199.

The Fifth Circuit in *Stevens v Corbell* held, "Since it is well-settled in this Circuit that knowing use of excessive force in booking an arrestee violates the arrestee's constitutional rights, the defense of qualified immunity is unavailable to a police officer who the plaintiff has alleged thus used excessive force." 832 F2d 884, 890 (5th Cir 1987). As here, the officer there was booking the plaintiff into jail. As here, the officer there continued to beat the plaintiff into and beyond the point of consciousness. Id at 866. Indeed, the Fifth Circuit observed that "there is no real dispute about what the law authorized" in those circumstances. Ibid. This Court likewise has little trouble concluding that the law has long been clearly established that an officer can't continue to beat an arrestee well after he becomes unconscious. Every reasonable officer would have understood that doing so violates a person's constitutional right. *Mullenix*, 136 S Ct at 308.

Other more recent decisions are in line with this basic proposition. As Judge Sim Lake recently observed, "there is a well-developed body of case law in the Fifth Circuit specifically holding that the use of physical force against a restrained, passively resisting or non-resisting subject violates the constitution." *Salcido as Next Friend of KL v Harris County, Texas*,

2018 WL 6618407, *13 (SD Tex). Judge Lake cited *Bush v Strain*, 513 F3d 492, 501 (5th Cir 2008), which found it objectively unreasonable to "forcefully slam [the arrestee's] face into a vehicle while she was restrained and subdued," and *Williams v Bramer*, 180 F3d 699, 704 (5th Cir 1999), which found an allegation of choking that wasn't in response to any resistance or aggression by an arrestee was "sufficient to assert a constitutional violation." *Salcido*, 2018 WL 6618407 at *13; see also *Anderson v McCaleb*, 480 F Appx 768, 773 (5th Cir 2012) (clearly established law put officers on notice that they couldn't tase or beat plaintiff once he stopped resisting arrest).

All of this is especially true where an officer uses force even after the suspect is rendered unconscious. *Corbell*, 832 F2d at 890. As the Northern District of Texas observed over a decade ago, "The court cannot hold that a reasonable officer would not have known that beating and punching an unconscious detainee and intentionally slamming a detainee into door jambs while transporting him was unlawful." *Smith v Aguirre*, 2009 WL 1683477, *6 n 3 (ND Tex).

Taylor asserts that he was beaten past the point of unconsciousness and that the beating continued beyond any notion of resisting or attempting to flee. The allegations also indicate that he wasn't a continuing threat to Hartley or others around him after being rendered unconscious and that the beating only stopped because another officer pulled Hartley away and off of him. This sufficiently pleads facts that, if true, would overcome qualified immunity.

The motion by Hartley to dismiss the excessive-force claim based on assertion of qualified immunity must be denied.

5.   Motion to dismiss by Harris County

Taylor asserts Section 1983 liability against Harris County predicated on theories of failure to train, ratification, and an unconstitutional policy condoning illegal and improper conduct. He also brings claims under the Americans With Disabilities Act of 1990 and the Rehabilitation Act of 1973. Harris County moves to dismiss them all. Dkt 18.

### a.   Claims under 42 USC § 1983

Municipal liability under Section 1983 doesn't extend merely on a *respondeat superior* basis. *Monell v Department of Social Services,* 436 US 658, 691 (1978). The plaintiff must show that an official policy promulgated by the municipal policymaker was the moving force behind the violation of a constitutional right. *Piotrowski v City of Houston*, 237 F3d 567, 578 (5th Cir 2001). "The 'official policy' requirement was intended to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." *Doe v Edgewood Independent School District*, 2020 WL 3634519, *8 (5th Cir) (emphasis in original), quoting *Pembaur v Cincinnati*, 475 US 469, 479 (1986).

Taylor brings four separate counts under Section 1983 that mix and muddle his factual allegations in an overlapping and redundant way. Dkt 17 at ¶¶ 80–112. He at base asserts in Count 2 that Harris County failed to train Hartley on deescalation techniques, the reasonable use of force, and the proper procedure for filing offense reports. See generally id at ¶¶ 80–84, 86–87. He asserts in Counts 3 and 5 that Harris County has a policy of ratifying officers' illegal and improper conduct and/or shielding them from the consequences of such conduct. See generally id at ¶¶ 90–98, 104–07, 110–11; see also id at ¶ 85 (appearing also to include ratification in failure-to-train claim). And he asserts in Count 4 that Harris County has an actual policy of permitting its officers to perform illegal and improper conduct. See generally id at ¶¶ 104–07.

#### i.   Failure-to-train theory

The Supreme Court observes, "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v Thompson*, 563 US 51, 61 (2011). But a decision by a local government not to train certain employees about their legal duty to avoid violating citizens' rights may in some circumstances rise to the level of an official government policy for purposes of Section 1983. Id at 61–62.

To state such a claim, a plaintiff must plead that:

- o *First,* the training procedures of the municipality's policymaker were inadequate;
- o *Second,* the policymaker was deliberately indifferent in adopting the training policy; and
- o *Third,* the inadequate training policy directly caused the plaintiff's injury.

*Conner v Travis County*, 209 F3d 794, 796 (5th Cir 2000), quoting *Baker v Putnal*, 75 F3d 190, 200 (5th Cir 1996).

Municipal liability doesn't attach merely because "a particular officer may be unsatisfactorily trained" or "an otherwise sound program has occasionally been negligently administered." *City of Canton, Ohio v Harris*, 489 US 378, 390–91 (1989). The Fifth Circuit directs with the first element that the focus must be on the *adequacy* of the training program in relation to the tasks the particular officer must perform. *Snyder v Trepagnier*, 142 F3d 791, 798 (5th Cir 1998), quoting *City of Canton,* 489 US at 390. And so to defeat a motion to dismiss, the plaintiff must allege with specificity how the training program is defective in this regard. *Roberts v City of Shreveport,* 397 F3d 287, 293 (5th Cir 2005).

Taylor fails to meet his pleading burden on this first element. He alleges in Count 2 that Hartley's training was defective because it didn't include sufficient deescalation or use-of-force training. Dkt 17 at ¶¶ 81–82. He also claims that deescalation training is common practice in police departments across Texas. Id at ¶ 81. But this is wholly conclusory. Taylor neither alleges specific facts about the training protocols in Harris County nor describes any deficiencies in the program in light of Hartley's assigned duties. See *Snyder*, 142 F3d at 798. In short, he hasn't identified a specific training program or shown how it is inadequate. And without a sufficiently specified training program or defects, Taylor necessarily hasn't shown the *causation* required by the third element.

Taylor also fails to meet his pleading burden on the second element of *deliberate indifference*. This is "a stringent standard of fault," one "requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick*, 563 US at 61, quoting *Board of County Commissioners of Bryan County Oklahoma v Brown*, 520 US 397, 410 (1997). "Thus, when city

20

policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program." *Connick*, 563 US at 61. A municipality's deliberate indifference typically requires a plaintiff to allege a pattern of similar constitutional violations by untrained employees. Id at 62. A plaintiff must generally show that, given the duties assigned to specific officers or employees, "the need for more or different training is obvious, and the inadequacy is likely to result in the violation of constitutional rights." *City of Canton*, 489 US at 390.

Taylor alleges no pattern of similar constitutional violations by other allegedly untrained employees, which is "ordinarily necessary" to establish the requisite deliberate indifference to state a failure-to-train claim. *Connick*, 563 US at 62. He instead seeks to use Hartley's conduct—and only Hartley's conduct—to state his claim. For instance, he refers to prior instances of alleged abuses by Hartley regarding verbal harassment, derogatory remarks, sleeping on the job, bullying, and the like. Dkt 17 at ¶¶ 69–72. These actions, Taylor says, "evidence his plainly inadequate training, supervision, and/or discipline by Harris County in the use of de-escalation techniques for officers." Id at ¶ 81f; see id at ¶ 82b (same as to reasonable use of force) and ¶ 83d (same as to preparation of offense reports). But none involve any application of physical force, excessive or otherwise. The same can be said—conclusory assertions about Hartley alone—as to allegedly deficient training on reasonable use of force and preparation of offense reports. As such, these couldn't have put any city policymaker on notice that its training was deficient on deescalation, use of force, and offense reporting. *Connick*, 563 US at 62–63.

Taylor fails to meet the pleading standards necessary to a failure-to-train claim. Count 2 must be dismissed.

## ii.   Ratification theory

The Supreme Court permits a ratification theory against a municipality to go forward in certain limited circumstances:

> [W]hen a subordinate's decision is subject to review by the municipality's authorized

21

> policymakers, they have retained the authority to measure the official's conduct for conformance with *their* policies. If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final.

*City of St Louis v Praprotnik*, 485 US 112, 127 (1988) (emphasis in original).

The Fifth Circuit had recognized the potential for a ratification theory even prior to *Praprotnik*. See *Grandstaff v City of Borger,* 767 F2d 161 (5th Cir 1985). And the Fifth Circuit considered a ratification theory under Rule 12(b)(6) standards earlier this year. On the pleadings in *Covington v City of Madisonville, Texas*, it found such theory sufficiently alleged to withstand motion to dismiss. 812 F Appx 219, 228–29 (5th Cir 2020) (unpublished). It specified as follows:

> Ratification in this context requires that a policymaker knowingly approve a subordinate's actions and the improper basis for those actions. Otherwise, unless conduct is "manifestly indefensible," a policymaker's mistaken defense of a subordinate who is later found to have broken the law is not ratification chargeable to the municipality.

Id at 228, citing *Praprotnik*, 485 US at 127; *Beattie v Madison County School District*, 254 F3d 595, 603 n 9 (5th Cir 2001); and *Coon v Ledbetter*, 780 F2d 1158, 1161–62 (5th Cir 1986).

The precise standard by which to plead a ratification theory is somewhat unclear as discussed and applied in other Fifth Circuit precedent. See *Hobart v City of Stafford*, 916 F Supp 2d 783, 794–97 (SD Tex 2013) (collecting precedent). But three points warrant analysis here. First, a clear prerequisite is knowing approval by a policymaker of both conduct and its underlying, improper basis. Second, a slightly different path by which to establish ratification appears by reference above to *manifestly indefensible* conduct. Third, although left out of the articulation above, a question exists whether Fifth Circuit precedent limits the

ratification theory to *extreme factual situations*. For example, see *Peterson v City of Fort Worth, Texas*, 588 F3d 838, 848 (5th Cir 2009). Each of these will be considered separately to the extent raised by Harris County.

But at the outset, Count 5 must be dismissed as entirely conclusory. It contains only two substantive allegations—first, that "Harris County ratifies, accepts, and approves of its officers' illegal and improper conduct such as Hartley's actions," and second, that "[t]his ratification shows a policy, procedure, custom, practice, or protocol of approving officers (particularly Hartley) to use unjustifiable and unreasonable force." Dkt 17 at ¶¶ 110–11. The prior paragraph does purport to incorporate by reference the entirety of all preceding paragraphs. Id at ¶ 109. But it is entirely unclear what this adds, given that it also incorporates the more-specific ratification claim pleaded in Count 3. On its own terms, Count 5 is plainly insufficient under the standards mandated by *Twombly* and *Iqbal*. And reference to Hartley's conduct alone to show a policy of ratification does nothing other than assert a variant of *respondeat superior* liability, which is impermissible.

The ratification theory pleaded by Taylor will only be considered further with respect to Count 3.

*As to knowing approval by a policymaker.* That a policymaker must knowingly approve both the actions of a subordinate and the improper basis of those actions accords with the more general principle that only policymakers can create municipal liability under Section 1983. And so they—and not just their subordinates—must be responsible for the violation. *Milam v City of San Antonio,* 113 F Appx 622, 627 (5th Cir 2004) (unpublished).

This means that the initial inquiry "is identification of officials or governmental bodies 'who speak with final policymaking authority for the local governmental actor concerning the action alleged to have caused the particular constitutional or statutory violation at issue.'" *Doe on behalf of MF v Harris County Precinct Six Constable Sylvia Trevino*, 2020 WL 1695054, *7 (SD Tex), quoting *Bolton v City of Dallas, Texas*, 541 F3d 545, 548 (5th Cir 2008). It isn't necessarily fatal at the pleading stage that the plaintiff fails to articulate "the specific

identity of the policymaker." *Groden v City of Dallas, Texas*, 826 F3d 280, 285 (5th Cir 2016). But he or she must still "plead *facts* that show that the defendant or defendants acted pursuant to a specific official policy, which was promulgated or ratified by the legally authorized policymaker." Id at 282 (emphasis in original).

Whether an individual is a final policymaker for a municipality is a question of state law. *Bolton*, 541 F3d at 548. Taylor brings his action here against Harris County. It has long been recognized in Texas that the county sheriff is a county's final policymaker as to law enforcement. *Turner v Upton County,* 915 F2d 133, 136 (5th Cir 1990) (collecting cases). The Harris County Sheriff is thus presumably the policymaker to whom Taylor must connect his ratification theory. Regardless, the question under *Groden* is whether the amended complaint alleges sufficient facts to suggest that the sheriff or another authorized policymaker for Harris County ratified Hartley's actions. It doesn't.

Broadly speaking, Taylor attributes all ratifying actions generically to "Harris County." For example, he alleges that Harris County "knows, should know, or must know that Hartley fabricated evidence" and that Harris County "allowed Hartley to fabricate evidence in order to protect himself and to permit the county to avoid having a record of his unreasonable conduct." Id at ¶¶ 91–92. And he alleges that "Harris County has failed to discipline or even admit that Hartley's actions were unreasonable." Id at ¶ 94. These allegations are deficient and conclusory even against the lenient standard of Rule 8(a)(2) requiring only "a short and plain statement of the claim showing that the pleader is entitled to relief." This is so because Taylor in no way connects this single instance of an excessive use of force by Hartley to the Harris County Sheriff or any other putative policymaker. But that is the requirement—the pleading of *facts* showing that the subordinate acted pursuant to a specified, official policy that was either promulgated or ratified by a legally authorized policymaker. *Groden*, 826 F3d at 282.

Hartley with a bit more specificity also alleges, "Harris County failed to respond to Plaintiff's demand letter, evincing Harris County believes Hartley's actions were reasonable and that he was free from any wrongdoing." Dkt 17 at ¶ 96. Yet both the

addressee and the contents of this letter are unknown because it is neither attached nor described in any way. But even if the Court were to infer that the Harris County Sheriff or some other policymaker received his demand letter and failed to subsequently investigate, it wouldn't sufficiently state a ratification claim under Fifth Circuit precedent.

For instance, the plaintiff in *Milam* asserted a ratification claim against the City of San Antonio arising from an alleged unlawful arrest. 113 F Appx at 628. He sent letters to city officials, some of whom were policymakers. Id. The "Municipal Integrity Division" of the city opened but never completed an investigation. Id at 623. The Fifth Circuit observed, first, that this didn't "present a situation where the policymakers have approved the 'decision and the basis for it.'" Id at 628, quoting *Praprotnik*, 485 US at 127. "That the policymakers failed to take disciplinary action in response to [the plaintiff's] complaints does not show that they knew of and approved the illegal character of the arrest, determining that it accorded with municipal policy." *Milam*, 113 F Appx at 628, citing *Praprotnik*, 485 US at 130. And second, the Fifth Circuit said that "it is hard to see how a policymaker's ineffectual or nonexistent response to an incident, which occurs well *after* the fact of the constitutional deprivation, could have *caused* the deprivation." *Milam*, 113 F Appx at 628 (citations omitted) (emphasis in original). So, too, here.

An instructive counterpoint is the Fifth Circuit's recent approval of the ratification claim as pleaded in *Covington*, which showed a genuine connection between the policymaker and the underlying conduct of the subordinate. 812 F Appx at 228–29. The plaintiff brought a ratification claim against the City of Madisonville arising from her unlawful arrest and consequent temporary loss of child custody. Her ex-husband was a police officer with the City of Madisonville. He hatched a plan to plant drugs in her car so he could regain custody of their children. She alleged that he frequently complained to other officers about his ongoing custody battle and urged them to try to find a reason to arrest her. Id at 222. The drugs were allegedly planted in her car by a confidential informant that her ex-husband recruited, and

she was subsequently arrested. The charges were later dropped, and the children were returned to her custody. Ibid.

The chief of police was a policymaker for the city. Id at 228. The plaintiff alleged that he ratified the conduct of her ex-husband—who was his subordinate—by failing to intervene to stop him and by covering up evidence of his culpability during the ensuing investigation. Id at 229. She also specifically alleged that the police chief failed to provide audio recordings to investigators and failed to properly label and investigate a statement written by a confidential informant asserting that her ex-husband had offered to pay him to plant drugs in the plaintiff's car. The Fifth Circuit held that these facts, when considered together with the plaintiff's assertions that the police chief failed to supervise her ex-husband prior to the planting of drugs in her vehicle, were sufficient to survive a motion to dismiss. Ibid.

The facts in Taylor's complaint are much closer to those in *Milam* than in *Covington*—while falling short of both. Unlike *Covington*, Taylor alleges no facts suggesting that the Harris County Sheriff or another policymaker was in any way involved in Hartley's misconduct or had ever received a complaint involving excessive use of force. He instead primarily bases his ratification claim upon the lack of response to his demand letter and a lack of investigation and discipline. Dkt 17 at ¶¶ 94, 96. That is insufficient under *Milam*. Indeed, the Fifth Circuit there noted that the Supreme Court in *Praprotnik* "recognized that policymakers who '[s]imply go[ ] along with' a subordinate's decision do not thereby vest final policymaking authority in the subordinate, nor does a 'mere failure to investigate the basis of a subordinate's discretionary decisions' amount to such a delegation." 113 F Appx at 627, quoting *Praprotnik*, 485 US at 130. The Fifth Circuit specifically observed that such limitations on municipal liability "are necessary to prevent the ratification theory from becoming a theory of *respondeat superior,* which theory *Monell* does not countenance." *Milam*, 113 F Appx at 627.

Taylor hasn't pleaded the requisite knowing approval of a policymaker because he alleges neither the policymaker nor his or her connection to the policy or conduct subject to ratification. *Groden*, 826 F3d at 282.

26

*As to "manifestly indefensible" conduct.* The Fifth Circuit in *Covington* cited *Coon*, 780 F2d at 1161–62, with respect to ratification of conduct that is otherwise "manifestly indefensible." The sheriff in *Coon* defended the conduct of his deputies based upon their version of a contested incident. The Fifth Circuit held that this didn't support ratification liability where their version "did not show that the deputies' actions were manifestly indefensible." Id at 1162. As more recently stated, "a policymaker who defends conduct that is later shown to be unlawful does not necessarily incur liability on behalf of the municipality." *Peterson*, 588 F3d at 848, citing *Coon*, 780 F2d at 1161–62.

Taylor pleads contrary to this requirement. He specifically avers that Hartley stated in the offense report of the incident that, after he initially struck Taylor, "Plaintiff rose up against Hartley" and "Plaintiff made attempts to continue to strike Hartley." Dkt 17 at ¶ 58. Taylor also alleges in the same paragraph that those statements and that explanation were a lie. Ibid. But whether the statements in the offense report are true or not isn't the issue. The question is whether that "version of events" shows conduct by the subordinate that is "manifestly indefensible." *Coon*, 780 F2d at 1161–62; see also *Peterson*, 588 F3d at 848. It doesn't. To the contrary, that Hartley allegedly determined to fabricate the context of his beating of Taylor indicates that Harris County doesn't have in place a policy tolerating unreasonable and excessive use of force.

Taylor also alleges that other witness and video evidence established that the offense report wasn't accurate. See id at ¶¶ 59–60. But he pleads nothing to suggest that such information was brought to the attention of an authorized policymaker. This claim will be dismissed without prejudice as noted below, with the claim against Hartley proceeding to discovery as discussed above. Taylor may seek leave to replead this aspect of his ratification claim if discovery shows that the referenced video and witness statements were before and considered by the Harris County Sheriff or other policymaker.

*As to extreme factual scenario.* A question exists under Fifth Circuit precedent whether ratification theory is necessarily limited

to "extreme factual situations." For example, see *Peterson*, 588 F3d at 848. This line of authority derives from *Grandstaff*, where the Fifth Circuit found ratification by a municipality when a group of police officers mistook an innocent man for a fugitive, surrounded him, and killed him in a blaze of gunfire poured on his truck. 767 F2d at 171. Later, the Fifth Circuit has at times indicated a limitation of this theory to *extreme factual scenarios*, while finding the circumstances under review insufficiently extreme. See *Snyder*, 142 F3d at 798 (declining to find ratification in case where officer shot fleeing suspect in back); *Peterson*, 588 F3d at 848 (declining to find ratification where officer detained suspect and struck his knee); *World Wide Street Preachers Fellowship v Town of Columbia*, 591 F3d 747, 755 (5th Cir 2009) (declining to find ratification where officer told protesters to leave intersection).

But there is a lack of clarity on this point. Not all Fifth Circuit ratification cases address or appear to require proof of an extreme factual scenario. Or at least it isn't referenced as such in the given procedural posture, even where the underlying allegations aren't *extreme* in the same sense presented in *Grandstaff*. For example, see *Turner* 915 F2d at 136 (false charges, summary judgment); *Beattie*, 254 F3d at 603 (employment, summary judgment); *Milam* 113 F Appx at 626 (illegal arrest, trial); *Chavez v Brownsville Independent School District*, 135 F Appx 664, 679 (5th Cir 2005) (unpublished) (employment, summary judgment).

Confounding this further, the Court is only aware of two Fifth Circuit ratification cases at the motion to dismiss stage, and neither turned on whether the background facts were sufficiently extreme. One is *Covington*, which facts have been described previously. It didn't include any reference to an *extreme factual scenario* as part of the pleading standard stated there. The other is *Culbertson v Lykos*, where the Fifth Circuit addressed ratification of an underlying First Amendment retaliation concerning Harris County's decision not to renew a breath-alcohol testing contract with a certain lab because two of their employees had spoken out about problems with the tests. 790 F3d 608, 621 (5th Cir 2015). It there recognized this limitation—but then found ratification sufficiently alleged to withstand a motion to dismiss without any analysis of whether the factual scenario was sufficiently extreme.

*Id* at 623. And as with the cases cited immediately above, neither *Covington* nor *Culbertson* presented facts even approximating the type of extreme scenario at issue in *Grandstaff*. See *Hobart*, 916 F Supp 2d at 796 (determining whether an underlying violation is an "extreme constitutional violation or only a garden-variety constitutional violation is an ill-defined task").

Harris County seeks dismissal on this basis. Dkt 18 at 17. The Court needn't resolve this issue given the disposition above. It will be addressed further if Taylor seeks to replead this claim. And if so, the parties will be required to provide more than the single paragraph of argument sponsored by Harris County in its motion and the single sentence provided by Taylor in his response. See Dkt 18 at 17; Dkt 22 at 29.

### iii.   Policy permitting officers to perform illegal and improper conduct

To establish municipal liability under Section 1983 based on an unconstitutional policy, a plaintiff must show that an official policy promulgated by the municipal policymaker was the moving force behind the violation of a constitutional right. *Piotrowski*, 237 F3d at 578. A plaintiff must thus plead:

- *First,* the existence of an official policy;
- *Second,* the policymaker promulgated the policy; and
- *Third,* the policy caused the plaintiff's injury.

*Peña v City of Rio Grande City*, 879 F3d 613, 621 (5th Cir 2018), quoting *Hicks–Fields v Harris County*, 860 F3d 803, 808 (5th Cir 2017).

*Official municipal policy* includes "the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick*, 563 US at 61. As framed by the Fifth Circuit, a complaint's "description of a policy or custom and its relationship to the underlying constitutional violation . . . cannot be conclusory; it must contain specific facts." *Peña*, 879 F3d at 621, quoting *Spiller v City of Texas City, Police Department* 130 F3d 162, 167 (5th Cir 1997); see also *Oliver v Scott*, 276 F3d 736, 741 (5th Cir 2002) (necessary to plead specific conduct and facts giving rise to constitutional violation). And as already discussed,

to satisfy the *policymaker* element a plaintiff must "plead *facts* that show that the defendant or defendants acted pursuant to a specific official policy, which was promulgated or ratified by the legally authorized policymaker." *Groden*, 826 F3d at 285 (emphasis in original).

Count 4 repeats the allegations that "Harris County" has failed to discipline Hartley, despite being aware of this incident and his prior behavior. See Dkt 17 at ¶¶ 101–105. To the extent this appears to assert a policy based on ratification, it is a repackaging of the same allegations deficiently pleaded in Counts 3 and 5. That has already been rejected above.

Beyond this, Taylor fails to meet his pleading burden on the first element. It isn't even clear whether the complained-of policy is written down or an unwritten custom. Instead, he only alleges that Harris County "permits its officers to perform illegal and improper conduct," and that this "failure to act shows a policy, procedure, custom, practice, or protocol of permitting officers (particularly Hartley) to use unjustifiable and unreasonable force without consequence." Id at ¶¶ 106–07. As with both Counts 2 and 5, this is wholly conclusory. Taylor doesn't plead specific facts about the alleged policy. He simply states that such a policy exists based only on Hartley's conduct. This is insufficient. *Pena*, 879 F3d at 621; *Scott*, 276 F3d at 741.

Taylor also fails to meet his pleading burden on the third element. Taylor needn't plead the specific identity of the policymaker, but he must plead facts showing a connection between the policy and an official policymaker. *Groden*, 826 F3d at 285. For instance, in *Groden* the Fifth Circuit dealt with First Amendment claims asserted against the City of Dallas that it had adopted a policy of "cracking down" on vendors engaging in unpopular-but-protected speech in and around the site of President Kennedy's assassination. The Fifth Circuit looked first to prior decisions holding that the "final policymaker" for Dallas is its city council. 826 F3d at 286, citing *Bolton*, 541 F3d at 550. And so the pertinent question was only "whether Groden has pled sufficient facts to suggest, for the purpose of a 12(b)(6) motion, that the city council promulgated or ratified the crackdown policy of which he complains." Ibid. The Fifth Circuit

concluded allegations were sufficient that pointed to public announcement of a new policy regarding "cracking down" on vendors at Dealy Plaza and the grassy knoll, where a city "spokesman" also gave media interviews describing the new policy. Ibid.

As with Taylor's ratification claim, he fails to connect the complained-of policy to an official policymaker. Taylor alleges no facts suggesting that the Harris County Sheriff or other authorized policymaker promulgated a policy of allowing officers to use unjustifiable and unreasonable force without consequence.

Taylor fails to meet the pleading standards necessary to an unconstitutional policy claim. Count 4 must be dismissed.

### iv.   Potential for repleading

Taylor has already amended his complaint once. See Dkts 15, 17. A district court "should freely give leave [to amend] when justice so requires." FRCP 15(a)(2). "But leave may be denied when it would cause undue delay, be the result of bad faith, represent the repeated failure to cure previous amendments, create undue prejudice, or be futile." *Morgan v Chapman*, 2020 WL 4558954, *7 (5th Cir), citing *Smith v EMC Corp*, 393 F3d 590, 595 (5th Cir 2004).

The claims against Harris County for failure to train (Count 2), ratification (Counts 3 and 5), and an unconstitutional policy permitting illegal and improper conduct (Count 4) will be dismissed without prejudice. Taylor may bring a motion seeking leave to amend on or before the discovery deadline of April 15, 2021. Dkt 31. If discovery reveals the involvement of an authorized policymaker with sufficient knowledge—and as to Counts 2 and 4, specific facts about the complained-of policies—Taylor may seek leave to amend. Taylor is instructed to reassert only one ratification claim, if at all.

### b.   Claims under the Americans With Disabilities Act and the Rehabilitation Act

Taylor asserts claims under the Americans With Disabilities Act of 1990 and the Rehabilitation Act of 1973. He proceeds under theories of discrimination and failure to accommodate. Dkt 17 at ¶ 114.

i.    Discrimination theory

Title II of the ADA provides, "Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 USC § 12132. It defines *public entities* to include local governments. 42 USC § 12131(1)(A). And it creates a private right of action against them for monetary and equitable relief. See 42 USC § 12133.

The language of Title II tracks the language of Section 504 of the Rehabilitation Act. *Hainze v Richards,* 207 F3d 795, 799 (5th Cir 2010). It "specifically provides that '[t]he remedies, procedures and rights' available under Section 504 shall be the same as those available under Title II." Id, quoting 42 USC § 12133. As such the elements necessary to state a case of discrimination under the Rehabilitation Act are "operationally identical" to those under the ADA. *Melton v Dallas Area Rapid Transit,* 391 F3d 669, 676 n 8 (5th Cir 2004).

To establish a *prima facie* case of discrimination under Title II of the ADA and Section 504 of the Rehabilitation Act, a plaintiff must demonstrate that:

o  *First,* "he is a qualified individual within the meaning of the ADA";

o  *Second,* "he is being excluded from participation in, or being denied benefits of, services, programs, or activities for which the public entity is responsible, or is otherwise being discriminated against by the public entity"; and

o  *Third,* "such exclusion, denial of benefits, or discrimination is by reason of his disability."

*Melton*, 391 F3d at 671–72; see also *Greer v Richardson Independent School District*, 472 F Appx 287, 291 n 1 (5th Cir 2012) (factors as pertinent to the Rehabilitation Act).

Harris County doesn't dispute that Taylor was a disabled person within the meaning of the ADA. But the second and third elements are both at issue.

Taylor alleges as to the second element that he was denied the opportunity to be booked and arraigned, to have his case reviewed for probable cause, and to have bail set at a hearing. Dkt 17 at ¶ 114b. The Fifth Circuit hasn't specified whether such services are within comprehension of the ADA. But the Southern District of Texas has previously considered whether arresting officers or prisons are public entities providing benefits that might possibly be denied. In *Hobart v City of Stafford*, the court applied Title II to an arrest, recognizing that a failure to accommodate a disability in that context might cause a person "to suffer greater injury or indignity in that process than other arrestees." 2010 WL 3894112, *10 (SD Tex), quoting *Gohier v Enright*, 186 F3d 1216, 1220 (10th Cir 1999). The Court assumes this sufficiently pleads the second element. Taylor ultimately fails to establish the third—that he was beaten and denied benefits *by reason of* his disability.

To show discrimination by reason of disability, a plaintiff "must show that the denial was intentional." *EM b/n/f Guerra v San Benito Consolidated Independent School District*, 374 F Supp 3d 616, 624 (SD Tex 2019), citing *Delano-Pyle v Victoria County, Texas*, 302 F3d 567, 574 (5th Cir 2002). Several circuits have held that *deliberate indifference* is the correct standard by which to determine *intentionality* in this context. See *McCollum v Livingston*, 2017 WL 2215627, *2 n 3 (SD Tex) (collecting cases from Second, Third, Ninth, Tenth, and Eleventh Circuits). They suggest that this standard corresponds to the remedial goals of the ADA and the Rehabilitation Act. For instance, when discussing their enactment, the Supreme Court noted, "Discrimination against the handicapped was perceived by Congress to be most often the product, not of invidious animus, but rather of thoughtlessness and indifference—of benign neglect." *Alexander v Choate,* 469 US 287, 295 (1985). The Third Circuit thus observed that "a standard of deliberate indifference, rather than one that targets animus, will give meaning to the RA's and the ADA's purpose to end systematic neglect." *SH ex rel Durrell v Lower Merion School District*, 729 F3d 248, 264 (3d Cir 2013).

But the Fifth Circuit has declined to hold that deliberate indifference "suffices." *Smith v Harris County, Tex*, 956 F3d 311,

318 (5th Cir 2020); see also *Perez v Doctors Hospital at Renaissance, Ltd*, 624 F Appx 180, 184 (5th Cir 2015) (unpublished) (declining to make new law on standard of intent). It has instead "relied 'on the widely accepted principle that intent requires that the defendant at least have actual notice," while leaving the "precise contours" somewhat less delineated. *Smith*, 956 F3d at 318, quoting *Miraglia v Board of Supervisors of Louisiana State Museum*, 901 F3d 565, 574 (5th Cir 2018). That principle is alone enough to resolve the issues at hand.

The amended complaint states, "Hartley intentionally discriminated against Plaintiff through his hostility, provocation, and beating of Plaintiff whose disability was a significant and/or the only factor causing Hartley's actions." Dkt 17 at ¶ 114c. This is entirely conclusory and says nothing about what was known to Hartley at the time. The amended complaint in the same passage does refer—again in conclusory terms—to Taylor's disability as "known, open, and obvious." Id at ¶ 114. But as discussed next on his failure-to-accommodate theory, this specifies nothing about *why* his disabilities were open and obvious to Hartley or otherwise known to him.

Simply put, Taylor fails to plead sufficient facts permitting an inference that Hartley had notice of Taylor's disabilities. Indeed, nothing suggests that he and Hartley had any substantial interactions through which Hartley could have ascertained Taylor's disabilities prior to the alleged incident. The first factual allegation putting them in close proximity is reference to Taylor's turn to be checked in and moved into the courtroom for his initial appearance. This is when Hartley told him in pejorative terms to remove his hat. Id at ¶ 32. No other exchange is indicated between them. Nothing references what Taylor was saying, doing, or otherwise manifesting while waiting his turn in line.

As a result, the claim based on an intentional discrimination theory must be dismissed.

ii.    Failure-to-accommodate theory

In addition to prohibiting discrimination, the ADA and the Rehabilitation Act "impose upon public entities an affirmative obligation to make reasonable accommodations for disabled individuals." *Smith*, 956 F3d at 317, quoting *Bennett–Nelson v*

*Louisiana Board of Regents*, 431 F3d 448, 454 (5th Cir 2005). To establish a *prima facie* case on a failure-to-accommodate claim, a plaintiff must show that:

- o *First,* "he is a qualified individual with a disability";

- o *Second,* "the disability and its consequential limitations were known by the covered entity"; and

- o *Third,* "the entity failed to make reasonable accommodations."

*Smith*, 956 F3d at 317, quoting *Ball v LeBlanc*, 792 F3d 584, 596 n 9 (5th Cir 2015).

As to the first element, Taylor alleges that his disabilities include epilepsy, lack of motor functions, speech impediments, brain damage, and mental illness. Dkt 17 at ¶ 21. As to the third, he claims that he required at least ten accommodations that he didn't receive, including a system more adept at cataloguing his physical and mental needs, a mental health screening, better training for jail staff, and more rigorous monitoring and observation. Id at ¶ 126. Harris County doesn't put either of those elements at issue here.

It does contest the second. To satisfy the *knowledge* element, a plaintiff must ordinarily show "that they identified their disabilities as well as the resulting limitations to a public entity or its employees and requested an accommodation in direct and specific terms." *Smith*, 956 F3d at 317, citing *Windham v Harris County, Texas*, 875 F3d 229, 237 (5th Cir 2017). Absent a request in this manner, a plaintiff can only prevail "by showing that the disability, resulting limitation, and necessary reasonable accommodation were open, obvious, and apparent to the entity's relevant agents." *Smith*, 956 F3d at 318 (quotation marks and citations omitted). The Fifth Circuit holds that well-understood and outwardly visible disabilities such as blindness, deafness, or being wheelchair-bound can present situations where the disability, resulting limitation, and reasonable accommodation are apparent. *Windham*, 875 F3d at 238. But mental disabilities aren't necessarily apparent due to their often hidden or obscured nature. *Taylor v Principal Financial Group, Inc*, 93 F3d 155, 165 (5th Cir 1996).

At issue is whether Taylor's disability and the accommodations it required were known by the jail staff. Harris County observes that Taylor doesn't allege that he requested any specific accommodation. Dkt 18 at 10. Taylor tries to bridge that gap by stating throughout his complaint in conclusory terms that his disability and need for accommodation were *open and obvious.* Dkt 17 at ¶¶ 10, 31, 33, 37, 51, 55, 114, and 121. But his mental impairment and resulting limitations aren't obvious "outwardly visible" disabilities—at least not without some specification of what was going on at the pertinent time or actually manifested to the person or persons alleged to have failed to provide the required accommodation. *Windham,* 875 F3d at 238.

There is no indication in the amended complaint of any prior exchange by Taylor with the jail staff. And nothing suggests that they would have had opportunity to learn about his disabilities or known what type of accommodations those disabilities would have required. To the contrary, the factual allegations begin with Hartley waiting in line for booking—and that Hartley "was being 'mouthy' to all the inmates," not just to him. Dkt 17 at ¶ 30. Hartley then used provocative language against Taylor, to which Taylor reacted by lunging at Hartley, followed by the beating that is at issue. Id at ¶¶ 32, 34–39. The excessiveness of that beating is troubling and goes forward on Taylor's claim under Section 1983 as a violation of his constitutional rights. But its connection to his disability and a need for accommodation simply hasn't been established.

The Fifth Circuit quite clearly holds, "In the context of a failure-to-accommodate claim, intentional discrimination requires at least actual knowledge that an accommodation is necessary." *Smith*, 956 F3d at 319, citing *Cadena v El Paso County*, 946 F3d 717, 724 (5th Cir 2020). Short of any facts or explanation as to *why* his disabilities would have been open and obvious at the time requiring accommodation, it is an insufficient conclusory averment. *Twombly*, 550 US at 557.

The claim based on a failure-to-accommodate theory must be dismissed.

   iii.  Potential for repleading

 Harris County moved to dismiss the ADA and Rehabilitation Act claims in Taylor's original complaint. Dkt 6. Before reassignment to this Court, Judge Ewing Werlein addressed this in a status conference in April 2019. Dkt 15. The parties there agreed to allow Taylor to file an amended complaint, and the motion to dismiss was mooted. The minute entry from that conference in part states, "Plaintiff's counsel agreed that Plaintiff would not seek leave to file any further amendment regarding Plaintiff's ADA and Rehabilitation Act Claims." Ibid.

 These claims will be dismissed with prejudice.

   6. Conclusion

 The motion to dismiss by Harry Hartley is DENIED. Dkt 19. The claim against him under 42 USC § 1983 for excessive force in violation of the Fourth Amendment will continue through discovery.

 The motion to dismiss by Harris County is GRANTED. Dkt 18. The civil rights claims under 42 USC § 1983 asserting municipal liability are DISMISSED WITHOUT PREJUDICE. The claims under the American With Disabilities Act and the Rehabilitation Act are DISMISSED WITH PREJUDICE.

 SO ORDERED.


Signed on September 22, 2020, at Houston, Texas.


Hon. Charles Eskridge
United States District Judge